**CHANCE et al. v. LEHIGH NAV. COAL CO.**

No. 9637.

District Court, E. D. Pennsylvania.

Oct. 11, 1938.

John H. Austin, Wallace D. Newcomb, and Henry N. Paul, Jr., all of Philadelphia, Pa., Merrell E. Clark, of New York City, and Hugh M. Morris, of Wilmington, Del., for plaintiffs.

Dexter N. Shaw and Charles H. Howson, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for the infringement of a group of six patents having to do with process or apparatus for washing anthracite coal. They are all for improvements upon what is conceded to be a basic patent involving invention of a high order —No. 1,224,138 to Chance, which expired in 1934 and is not in suit. The invention of that patent lay in creating in a washing tank an "artificial" fluid mass, consisting of an agitated mixture of sand and ·water, of such specific gravity that when the mixture of broken coal and slate was dumped into it the heavier pieces of slate sank to the bottom and the lighter coal floated off. Prior systems depended entirely upon upward currents of water and any fluid mass which they may have used consisted merely of small particles of the separated materials.

The defenses are invalidity and noninfringement. A preliminary question raised is whether the defendant is estopped to plead invalidity, by reason of having used the patents under license at some of its collieries.

The expired patent issued May 1, 1917. Commercial use of it did not begin until 1921. By that time the first patent in suit had been applied for, and, according to the plaintiff, the second and third had been conceived. The plaintiff says that the first plant which used the system embodied the structures of these three as well as that of the basic patent.

In 1929 the defendant (or its predecessor) took a license for its Alliance colliery. In addition to being a license under the (now) expired patent, it included the right to use, without additional royalties all improvements invented by Chance. At the same time the plaintiff also gave the defendant an option, or agreement to issue to it "other like licenses carrying the same terms and conditions as the aforesaid license of this date, and when requested by you to cover other Sites now owned, controlled or managed by you. * * *" In 1930 the defendant took a second license for its Cranberry colliery.

In 1935 the defendant determined to remodel its old colliery at Tamaqua and to install the type of washing system covered by the Chance patents. How many features of the improvement patents, as distinguished from the expired patent, were incorporated into it is in dispute. The plant was completed and put into operation in October, 1935. The installation and operation of this plant is the basis of this infringement suit.

While the Tamaqua plant was in the course of construction there were some negotiations about the terms of a new license for it, but when a license agreement was presented ·on September 6 it was not acceptable to the defendants. As a matter of fact, it was not a license "carrying the same terms and conditions" as the Alliance license. Provisions as to termination, acknowledgment of validity of patents, etc., were somewhat changed; but it is plain that the defendant would not have accepted the license had its terms been the same in all particulars. What the defendant seriously objected to was paying the same rate of royalty for improvement patents as that which it had been paying for the use of the then expired patent.

The essential facts in connection with these dealings between the parties (which were the subject of a great deal of testimony and argument) are that the defendant did not exercise its right to take a license under the option, and that it proceeded to operate the plant without any license.

The plaintiff contends that, inasmuch as the defendant is using a number of the patents in suit under license at Alliance, it is estopped to question their validity in this suit for infringement at Tamaqua.

I think that the doctrine of estoppel by license does not apply to the present case, for two reasons.

■ First: Any reasonable construction of the Alliance license agreement negatives the existence of an intention on the part of the defendant to admit the validity of

any patents other than the now expired basic patent.

Both parties agree that the estoppel here, if there is one, is by deed and not by conduct. Hence, its existence and extent depend entirely upon the construction of the license agreement at Alliance and the option of the same date. Both these contracts were prepared by the plaintiff (the license a printed form) and they are to be construed strictly against the party in whose words they are cast.

The license is to use patent No. 1,224,-138 (the expired patent). It expressly provides, in Paragraph 10, "Said Licensee hereby acknowledges the validity of said Patent and accepts a license thereunder, * * *" This paragraph comes in after another (Paragraph 8) which provides that the licensee shall have the right without paying additional royalties "to make and use any improvement adapted or invented to be used in the process of washing of anthracite coal * * * over which either said Thomas M. Chance or said Licensor shall obtain any right." It is followed by another (Paragraph 15) having to do with the use, after the expiration of Patent No. 1,224,138, of "subsequent patents covering improvements the rights to which are extended to said Licensee by Paragraph 8 hereof" and goes on to say "Patents now in effect and issued are: * * *" followed by a list of patents including the patents now in suit.

The license certainly does not expressly acknowledge the validity of any patents other than "said Patent" (No. 1,224,138) and the rather noticeable omission to include in the acknowledgement of validity a number of other patents which are part of the subject matter of the contract suggests that the parties intended that the defendant should be at all times free to take any position it wished with regard to them. There would have been no question at all had the parties said, "The Licensee does not acknowledge the validity of any patent mentioned other than No. 1,224,138," but, really, the effect of what they refrained from saying is about the same. There is nothing in the option or letter of August 29, 1929, which affects this question.

If the defendant were being sued for royalties for the use of the improvement patents at Alliance there might be a question of estoppel by conduct, or perhaps the validity of the improvement patents would be immaterial, since the royalties of the Alliance license are really paid upon the basic patent, and the use of the improvement patents might be construed merely as extending the term of those payments. That question is not here involved. This is a suit for infringement at a plant as to which admittedly no license has been taken, the only estoppel asserted is that which arises under the contract, and the contract plainly excludes the estoppel. The Court will not rewrite the contract to make it speak where it was intentionally silent.

■ Second: Even if the Alliance license could be construed as including an acknowledgement of the validity of the improvement patents which it mentions, that would not work an estoppel if the defendant chooses to test their validity by making use of them at some other colliery.

■ The doctrine of estoppel by license has become part of the law, but doubts as to its soundness have caused the grounds for it to be critically examined and to be restricted rather than enlarged. It is definitely settled that an estoppel does not continue beyond the term of the license. As Judge Denison pointed out in Indiana Mfg. Co. v. Nichols & Shepard Co., C.C., 190 F. 579, the estoppel depends upon the existence of a contract relationship between the parties with mutual rights and obligations. At the boundary of the contract relationship the estoppel ends. I see no reason why an act as to which there are no mutual rights or obligations because of a geographical limitation is any different from one as to which they are at an end by expiration of time. In Tate v. B. & O. R. Company, 4 Cir., 229 F. 141, the Court refused to apply the doctrine of estoppel after the completion of the number of patented articles for which the license provided, saying [page 142], "There is no longer any contract relation, and there is no ground of estoppel." This was not a time limitation.

In Cassidy v. Evan L. Reed Mfg. Co., D.C., 293 F. 797, Judge Lindley held that there was a contract relation between the parties which covered the whole country because the License contained a negative covenant quite plainly binding the licensee not to manufacture anywhere other than the place referred to. This case does not hold that where a license is confined to a particular place or plant the estoppel exists as to all other places and plants. There is here no negative covenant not

to use the patents at breakers other than Alliance. It cannot be implied from the option which simply gave the defendant the right to decide some time in the future whether it would or would not take a license.

This does not mean at all that the use of a patent in defiance of the terms of a license is "beyond the term of the license" and therefore not subject to the doctrine of estoppel.

My conclusion therefore is that the defendant is not estopped to question the validity of any of these patents.

### No: 1,392,399 ("Water on Top")

#### Claims 3 and 8

The advance claimed to have been made by this patent is that it provides a new method of operating a system similar to that of the expired patent so that not so much sand from the fluid mass will go out with the coal as it is floated out at the top. The sand has to be returned; and keeping the mass together in the tank means less expense and difficulty. The result accomplished by the patent is due to two things: First, if you have a layer of water on top of the fluid mass of sand and water, the coal will float higher on the fluid mass, and less sand will go out over the weir. Second, since the coal floats higher the clear water will wash off more of the sand from it as it moves toward the discharge.

I am unable to see that this patent did more than to call attention to certain advantages and economies which were inherent, though possibly latent, in the expired patent and to point out that the necessary conditions could be produced by operating the expired patent according to one of the exemplifications of it as disclosed in the specification and drawings, with perhaps some comparatively small engineering improvement to intensify and maintain it.

A weir discharge must be used, but the expired patent provides for a weir as an alternative form. Two of the drawings show what the specification describes as "an overflow discharge for separated light material." And it speaks of "the separated material of lower specific gravity being floated out of the receptacle—as in some forms of jigs. * * *"

It is also necessary that water be added to the fluid mass as the operation goes on. But, again, the expired patent says, "In the operation of the apparatus the mechanical losses of the fluid mass, that is, that portion of said mass carried away by the slate and coal, may be made up by the addition to tank 1 of fresh sand and water." Figs. I and II show the addition of sand and water at the top of the tank. As the plaintiff's expert pointed out, a return of sand and water to the top of the fluid mass was bound to result in the production of some water on top because the force of gravity carries much of the sand down before the new mixture gets into the agitated area. If an upward stream of water rising from the bottom of the tank is used for agitation (also suggested in the expired patent) this will add to the water on top.

Restricting the weir discharge is a mere· mechanical expedient. The specification of the patent in suit says, this "will be understood by any skilled in the art," and of course this idea does not involve invention.

It is perfectly clear from the testimony of the plaintiff's expert that special steps would have to be taken and special devices used in order to prevent the normal operation of the expired patent from producing a layer of water on top of the fluid mass. He even suggested that it might be necessary to have a supply of sand, and I suppose, keep dumping it into the top of the cone where the layer of water appears.

### No. 1,559,937 ("Water on Bottom")

#### Claims 5 and 6

As in the patent just discussed, the main purpose of this patent is to keep the fluid mass as nearly intact as possible, but this patent has to do with sand which descends to the bottom of the cone and is trapped out with the slate. Provision is made for an ascending column of water, coming up into the cone at its base through a conduit—a column of low velocity, just sufficient to lift the particles of sand and return them to the fluid mass while permitting the slate to drop freely into the refuse chamber. In addition to its principal function, the current assists in agitation and probably has something to do with maintaining "water on top."

These two claims refer to the rising current of water as a "classifying current" (claim 5) or an "upward current classifier" (claim 6). The testimony is undisputed that in the defendant's system the current is "just enough so that the sand is lifted

up, and, since the sand is so small in comparison with the slate, that has practically no effect on the falling of the slate." Hence, the defendant infringes claims 5 and 6 only if a column of water which merely sorts or separates one material from another and which has no classifying effect upon pieces of the same material of varying sizes is a classifier.

It is unnecessary to go into the controversy about the generally accepted or technical meaning of that term, because this patentee, as he had the right to do, defined it for himself for the purposes of his patent, and showed unmistakably that he did not intend that the mere separation of sand from slate was to be considered as classifying. In the specification it is pointed out that the current is ordinarily of extremely low velocity and only sufficient (1) to prevent the sand from descending with the slate, or (2) to keep a low concentration of sand in the water throughout the agitation chamber, thus producing a somewhat different medium. When operated in either of these ways, he says, "the current * * * is not employed to produce a * * * classifying effect on the separated materials." But he goes on to say that the apparatus may be so proportioned that the upward rising current will be of sufficient velocity to keep small particles of slate in the fluid mass, and "Then," he says, "the fluid medium * * * becomes in effect a classifier." I agree with the defendant that there could hardly be a more precise definition of a term in a patent specification. It seems plain that it was this third type of current of slightly higher velocity, sufficient to hold small particles of slate as well as sand in the fluid mass, that was intended to be covered by claims 5 and 6.

If this interpretation of the claims is correct the defendant does not infringe them because the Tamaqua column does not classify within the meaning of the patent, and that is my conclusion.

If the claims are construed broadly to cover the effect of the defendant's column, as the plaintiff contends, then the subject matter of the patent is clearly inherent in the expired patent and disclosed by its specification. There it is stated, "If too large a portion of the fluid mass is carried away by the separated material this may in many cases be removed from said material by * * * passing the material

* * * through any of the standard types of upward current hydraulic classifiers," which, the patentee points out, may be constructed integrally with the apparatus. Of course, if it is an upward current and is integral with the apparatus, it would be very awkward to put it anywhere except at the bottom or to arrange it so that the upward current did not come up into the agitation chamber.

The plaintiff says that there was no thought in the expired patent of using water to support the fluid mass and argues from that that the patent in suit is the first instance in which a float and sink apparatus is combined with a classifying column beneath it serving as a pedestal to support the fluid mass—permitting the separated material to sink through it, and yet preventing the sand from escaping the fluid mass. This idea of supporting the fluid mass which the plaintiff stresses seems to me largely a matter of words. The suggested upward current classifier of the expired patent would certainly wash the sand from the slate and lift it as far as the force of the water extends, and the effect of that is necessarily to support the fluid mass. So, again, we have a patent which merely points out and elaborates an effect which is inherent in one of the disclosures of the expired patent.

Nor can invention be found in the idea that the column of water is kept at such a low velocity that it will not disturb the fluid mass in its function of separation of materials. The expired patent says that the sand "Can be lifted by a current of water that will not disturb said material by any degree." Apart from this, there could be no purpose whatever in giving it a velocity which would churn up the agitation chamber and impair the efficiency of the separating process.

### Claim 4

Claim 4 does not specify that the upwardly rising current of water is a classifying current, and consequently is not subject to the limitation which has just been discussed. It is therefore in that respect as broad as claims 5 and 6 would be if construed in accordance with the plaintiff's views, and invalid for the same reason. There is some question whether the ascending column of water of claim 4 is supposed to pass through the conduit at all. The defendant says that it comes in at the side of the cone through inlets and that the water in the conduit does not

rise into the cone but is used only for the removal of slate. This does not seem to me of great importance, however, because the claim, so far as it broadly discloses the use of an upward current of water of low velocity to wash the slate clear of sand and return the latter to the fluid mass, is, equally with claims 5 and 6, a part of the disclosure of the expired patent.

Below the conduit this patent provides a valved refuse chamber with air vents, the purpose of which latter is to allow for the escape of air from the refuse chamber as it is filled with water and also to prevent air pockets and bubbles from rising into the fluid mass. The valved refuse chamber is indicated in the expired patent, which states that in certain of the figures, in place of the elevating devices, the slate may be "trapped out of the machine in the same manner that the slate is trapped out of the hutches, coal jigs and washers." A typical construction of this kind is found in the Robinson patent, No. 344,545 of 1886. As the specification recognizes, they are common in the prior art as means for removal of separated impurities from coal and other minerals, and invention is not involved in incorporating such a device with the agitation chamber. The air vent is plainly the air vent of the British patent to Benson, No. 972 of 1872, is common in engineering practice, and the same remark applies to it.

Claim 4, if construed in accordance with the plaintiff's view, that the upward current rises through the conduit, would probably be infringed by the defendant's structure, but, in view of the prior art and particularly the expired patent, it is invalid for want of invention.

Reissue No. 16,674 ("Sand Sump")

Claims 4 and 6

This patent has to do primarily with the return to the tank of sand unavoidably carried out with the coal. It provides a conical (inverted) vessel called a sand sump into which the wash water from the coal drains and from which it is pumped back into the agitation chamber through an outlet pipe located near the bottom. The wash water is discharged into the sand sump through a vertical pipe to a point near the bottom, so that it comes in with considerable velocity. The effect of this is that the sand does not settle into a bed as it otherwise might, but is kept in a state of agitation and can be more easily sucked out by the pump. In addition, there is a lot of silt, or fine coal particles, which comes into the sump with the sand. The discharge of the wash water at the bottom of the sump produces upwardly rising currents which operate as a classifier. The silt being very light is carried up to the top and goes out with the overflow. The sand is agitated but is not carried all the way to the top.

The invention, according to the plaintiff, resides primarily in putting the discharge end of the pipe near the bottom of the sump so as to keep the sand from settling, and secondarily in the correct proportioning of the cone and pipe and the regulation of the velocity with which the wash water is discharged so as to get a classifying effect which will take the silt out of the sump but leave the sand in it.

The question of invention over the prior Chance patent No. 1,392,401 is a close one, but need not be decided, because these claims are invalid as being for a different invention than that of the original patent, or, if construed in a way that might save them, would not be infringed.

The drawings of the original and the reissue patents are the same, but a reissue claim cannot stand solely upon a drawing of the original patent, nor unless the description in the original letters patent shows that the invention covered by that claim was intended to be secured in the original. See Hailes v. Stove Co., 123 U.S. 582, 587, 8 S.Ct. 262, 31 L.Ed. 284; Walker, Vol. II, p. 1,356. I think it plain that the subject matter of these claims and the invention which the plaintiff ascribes to them were something entirely different from the invention of the original patent. If it was even hinted at in the original patent, it was only as an adjunct in combination with the principal invention of the orginal which has been dropped out of these claims.

The original patent was primarily for a mechanical method of removing the separated materials from the agitation chamber, by which the sand and water in the chamber is also kept in a state of agitation and fluidity. It is a kind of screw or worm device, the agitation chamber being rotatable. Provision is made as part of the system for the return of sand carried out with the coal. There was, of course, nothing new about that. Another earlier Chance patent (No. 1,392,401) dis-

closed the general idea, whatever dissimilarities of detail there may have been.

The patent drawings of the original of this reissue show a sand sump and pump with a vertical discharge pipe descending to a point near the bottom of the sand sump, but there is nothing in the specification which indicates that the patentee thought that he was doing anything more than merely putting a hydraulic classifier into the system to get rid of the silt while keeping the sand.

The only description of it is found on page 3, lines 76 to 100 of the. original patent, where it appears that the sump may be proportioned so that it can operate as a hydraulic classifier to get the silt out, and keep the sand in. This idea of a hydraulic classifier as part of the system was not new, having been disclosed in the expired Chance patent, and it is obvious that Chance himself did not consider it any part of the invention on which the reissue is based.

I cannot find in the original any suggestion of what the plaintiff claims is the main purpose of the reissue patent, namely the continuous agitation of the sand in the bottom of the sump. No doubt that effect was present, but one must base this conclusion entirely on the drawing, and it cannot be found that the patentee said anything about it in his specification.

There is no doubt that the patentee was interested in maintaining fluidity in the agitation chamber—not so much as he was in his mechanical means for removing the separated material, but still to the extent that he recognized it as necessary. But there is not a word to indicate that he was in the least concerned with fluidity in the sand sump. If you set up a sand sump in accordance with the patent drawings you might obtain this, but either Chance himself did not realize this, or, if he did, he did not consider it more than a mere mechanical matter. In either case it seems clear that his omission to claim it was not due to inadvertence, but because it was not part of his original invention.

But even if it could be found that the germ of the sand sump invention was in the original patent it was there only in combination with a particular type (rotatable) of agitation chamber. It must be remembered that the general concept of separating coal and slate by means of a fluid mass composed of water and sand had already been invented and disclosed. The particular type of mechanism by which separated materials were removed from the agitation chamber was undoubtedly the primary thing to which the original patent was addressed and the point at which the patentee was endeavoring to advance the art. The specification insists on this rotating chamber and mechanism as an absolutely essential element of the combination. Thus it says at one point, "The apparatus necessary for the operation of the method must always consist of the following elements: a rotatable receptacle adaptable to containing a fluid mass of the desired type. * * *" It might be permissible in a reissue to claim the sand sump with the rotatable chamber, but not to claim it and at the same time broaden the remaining part of the combination to include all kinds of agitation chambers.

### No. 1,894,020 ("Valve Gear")

### Claim 8

I am of the opinion that the claim in suit taken in connection with claim 3 on which it depends shows no inventive advance over the prior art.

Gearing for the intermittent opening and closing of·a series of valves in a desired order of succession is about as well known as any mechanism that can be found. A competent engineer, given the task of designing a valve gear for a specific purpose, need hardly do more than turn to the existing art and select from it such elements or combinations as suit his purpose best. It seems to me that in view of the countless examples of mechanisms for the successive operation of valves, it would be a waste of time for him to attempt to exercise the inventive faculty independently of the prior art at his hand.

It obviously suited Chance's purpose to use a gear in which the application of energy to open either valve was effected by closing the other valve a predetermined distance. This made· the operation more nearly automatic, and consequently less subject to error than valves formerly used to trap out slate in coal washing processes where the judgment of the operator supplied a larger human factor.

Precisely such a structure appears in the Viesbeck German patent. The valves and gear of this patent are a complete anticipation of claim 3. The argument that it is used in connection with an apparatus which belongs to a non-analogous

art would be much stronger with almost any other type of mechanism. But valves and their operating gear are so widely interchangeable as practically to constitute an art in themselves and to leave little room for invention in incorporating one type or another in widely differing kinds of separating apparatus.

Having taken the Viesbeck mechanism it would not, in my judgment, constitute more than an engineering improvement, falling short of invention, to further provide for the delay of the movement of the upper gate valve until the filling of the refuse chamber with water, as an additional safeguard, by the use of an automatic pressure switch which responded to the filling of the chamber. Having determined upon an automatic delay, the idea of a pressure switch operated by the fluid of the filled · chamber follows naturally. In fact, it is difficult to see what other method could be adopted. Pressure switches are admittedly standard equipment, and the addition of the pressure switch to this type of valve is not, in my judgment, invention.

I have no doubt that the valve gear of the patent in suit was an improvement over the older valve operating mechanisms which had been successfully used. But when we consider the high degree of efficiency which through modern training ordinary mechanical engineers have attained, and that devices which seem remarkable to the layman are ordinary standard practice, it is impossible to find invention in this structure.

### No. 1,937,190 ("Rectilinear Flow")

### Claims 1 and 2

█ The validity of this patent has not been put in issue. Its infringement at the beginning of the operation of the Tamaqua plant was admitted. The only question is how long that infringement continued. I find as a fact that the infringement continued until November, 1935, or for a period of about a month, when the vertical baffles were removed and the structure now used was installed. . Since that time there has been no infringement for several reasons: first, because of the removal of the baffles; second, because the rotating rakes are close enough to the surface of the fluid in the cone to produce a rotary and not a rectilinear flow; and third, because the feed of the coal is below the top of the rakes and within range of the most pronounced rotary motion of the fluid medium.

I find that, since the date of the making of this change, this patent has not been infringed.

### No. 1,949,242 ("Independent Water Refill")

### Claims 2 and 3

This patent has for its principal object the separation of the source and means for introducing the agitation water from the source and means for introducing the water necessary to fill the refuse chamber. The difficulty with the former system was that the agitation water had to be delivered under a steady head, whereas the refuse chamber was emptied from time to time and required an intermittent and sudden influx of water to fill it. If, as in the "water-on-bottom" patent, these two functions were performed by the same system, you would have irregularities in the flow of agitation water and disturbances in the cone which obviously were to be avoided. The illustration given by the defendant of the bathroom equipped with toilet, wash basin and shower is a good one, the toilet corresponding to the refuse chamber, the .wash basin to the agitation water, and shower to the wash water. If the plumber fails to separate these systems, the basin and shower will be cut off or cut down whenever the toilet is flushed. Every modern system makes a separation of systems by means of an independent refill tank for the toilet, and this is approximately what this patent does. The claims in suit, however, are not nearly as broad as that, and, in addition, they disclose another secondary object, which is to fill the collecting tank and the refuse chamber by gravity without the expenditure of additional energy in pumping. This is done by putting the filling chamber below the sand sump but not above the level of the refuse chamber.

█ Both claims in suit call not only for means to discharge the water from the sand sump into the filling chamber, but also for means connecting the upper part of the sand sump directly with the filling chamber. Without regard to the importance of this element, there is no question that both the claims include it as part of the combination, and I do not see how infringement can be found unless it is present.

The defendant's accused system at Tamaqua contains no such element or any

equivalent, and consequently does not infringe. None of the water in its system used for the independent filling of the refuse chamber can come directly from the sand sump, but all of it goes into a refill chamber and thence into the refuse chamber. Consequently these claims are not infringed.

The defendant also argues that it does not infringe because, before the water is allowed to flow by gravity into the refuse chamber, it is raised by pump to the refilling chamber. Hence, says the defendant, it does not infringe because its means are not "means permitting the fall of the liquid so collected * * * into said chamber." I think that this point is well taken. It seems to me that the entire intent of the patent with respect to its secondary purpose is the use of gravity only as the force to refill the refuse chamber, and the mere fact that there is gravity fall from the refill chamber to the refuse chamber is not sufficient to infringe the claims. In other words, the introduction of a pump would seem to entirely defeat one of the express purposes of the patent, although it is undoubtedly a secondary purpose. It is not necessary, however, to put noninfringement upon this ground, since it seems to me so clear upon the other.

Since there is no infringement the question of validity is not passed upon.